**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAFAYETTE-OPELOUSAS DIVISION**

| | |
|---|---|
| **JARETHER CARTER o/b/o** <br> **J.A.C.** | **CIVIL ACTION NO. 07-1731** |
| **VS.** | **JUDGE MELANÇON** |
| **MICHAEL J. ASTRUE** <br> **COMMISSIONER OF SOCIAL SECURITY** | **MAGISTRATE JUDGE METHVIN** |

**REPORT AND RECOMMENDATION**

Before the court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be **REVERSED**.

*Background*

On January 27, 2004, Jarether Carter, filed an application for supplemental security income benefits on behalf of her son, J.A.C., now age 14, alleging disability due to Attention Deficit Hyperactivity Disorder ("ADHD"). (Tr. 200-202, 217). J.A.C.'s application was denied on initial review, and an administrative hearing was held on July 12, 2006. (Tr. 527-579). On. October 19, 2006, the ALJ denied benefits on grounds that J.A.C. did not have a disabling impairment. (Tr. 15-24). The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner from which J.A.C. now appeals.[1]

---

[1] A May 12, 2008 Wechsler Intelligence Scale for Children - IV showed that J.A.C. obtained a full scale IQ of 55 which reflected mild mental retardation. Carter advises that she submitted these test results together with a new application for SSI benefits and, on October 1, 2008, J.A.C. was awarded benefits as of June 1, 2008.

## *Standard of Review*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen , 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

## *Childhood Disability Benefits*

An individual under age 18 may be found disabled "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(C)(I).

The regulations provide a three-step sequential evaluation process for determining whether a child's impairments result in "marked and severe limitations." First, if the child is engaging in "substantial gainful activity," the child will be found not disabled regardless of medical condition or age, education, or work experience. 20 C.F.R. §416.924(b). Second, the

child must have a severe impairment or impairments. If the child suffers from a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations, the child will be considered to have no severe impairment, and therefore to be not disabled. Title 20 C.F.R. §416.924(c). Third, the child will be considered disabled if his or her impairment(s) meet, medically equal, or functionally equal in severity a listed impairment in Appendix 1 of Subpart P of Part 404 of the chapter. If a child's impairments do not meet or medically equal a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairments to determine whether the functional limitations are disabling. 20 C.F.R. §§ 416.926a (functional equivalence for children). *See*, *e.g.*, Luckerson v. Apfel, 2000 WL 1222125 (N.D. Ill. Aug. 22, 2000).

### *ALJ's Decision*

The ALJ found that J.A.C.'s ADHD is a severe impairment. The ALJ concluded, however, that J.A.C.'s impairments do not meet, medically equal, or functionally equal the criteria of any of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.

### *Assignment of Errors*

Carter alleges that the ALJ failed to fully and fairly develop the facts resulting in prejudice and that the ALJ erred in finding that J.A.C.'s condition did not functionally equal a listed impairment in Appendix 1.

### *Findings and Conclusion*

J.A.C. and his mother testified at the hearing as well as a medical expert, Dr. Glen E. McClure, Ph.D., a psychologist, who testified by video.

*Ms. Carter and J.A.C.'s Testimony*

J.A.C. was born in New Orleans and lived there with his mother until Hurricane Katrina struck on August 29, 2005, after which they moved to Oakdale, Louisiana. Ms. Carter testified at the administrative hearing as follows:[2] J.A.C. has been misbehaving and being disrespectful since he was "knee high"; he has made "funny sounds and stuff" since he has been in pre-kindergarten; J.A.C.'s grades were good until pre-K and then they started dropping; his problems are mainly with math; his New Orleans school recommended that he be seen at a psychological clinic but Katrina intervened; J.A.C. takes his medication but even so, if children "mess with him he gets real angry bad"; he was suspended from school a lot of times in New Orleans but was never expelled; when he was 4 or 5, J.A.C. would defecate in the classroom, could not sit still, and would run around; J.A.C. began taking Atretol and Depakote in 2004 for his hyperactivity; after Katrina, they moved to Oakdale, where J.A.C. was expelled in 2006; J.A.C. had to complete his work at home with a tutor; J.A.C. did complete his work but he had D's and F's; J.A.C. attended the Behavior Clinic in Oakdale every day when he was in school, and once a week after he was expelled; J.A.C. cleans his room and washes dishes when reminded; he is able to take care of his own personal hygiene.

J.A.C. testified that he had problems at his Oakdale school because he fought when people "messed" with him; he only talked back to two of his six teachers; he rode the bus, read "big books," and played baseball with friends after school; math is hard for him "all the times"; he fought because children knocked his pencils out of this hand; he hears all kinds of voices that

---
[2] Tr. 538-549.

tell him to do his "work and stuff"; he gets off track because of the voices that "come from his head"; he had bad dreams that woke him up at night, and he could not go back to sleep.[3]

### *Medical and School Records*

Medical records show that, when J.A.C. was in third grade, his school referred him to Dr. Edwin Lin, M.D., for ADHD evaluation on December 15, 2003. (Tr. 323). Dr. Lin, in turn, referred J.A.C. to Dr. Patrick J. Dowling, M.D., a child and adolescent psychiatrist, on December 22, 2003. (Tr. 329).

In his Care and Development Evaluation, Dr. Dowling noted that Ms.Carter reported that J.A.C. talks in his sleep. He "gets mad fast" and will play, then fight with neighbors (Tr. 329). Dr. Dowling opined that J.A.C. was of "dull normal intellectual ability." (Id.). His attention span was short, and he was distractible. His mood was depressed, and he was restless. He admitted fighting in class, being suspended, and that his cousin and older brother always got mad at him and made him cry. Dr. Dowling diagnosed depression NOS, ADHD and developmental expressive language disorder. (Tr. 330). He prescribed Adderall and Wellbutrin.

On February 26, 2004, Ms. Katie Franklin, J.A.C.'s home-room teacher, cataloged some of his actions in her classroom. (Tr. 449-450). She separated him from the rest of the classroom because he preferred to work alone. Before he was on medication, his disruptive behaviors began immediately in the morning. Ms. Franklin stated that although J.A.C.'s behavior changed substantially with medication, he still had outbursts. She noted that on one occasion, J.A.C. complained and yelled that there was too much noise in the classroom, and scattered books from the class shelves all over the floor. The next day, he got angry at a classmate and continued

---

[3] Tr. 557-569

yelling even after the student was sent out. He also continually kicked at a door while seated, saying that he was paying his classmates back for keeping him from being able to concentrate. Ms. Franklin recommended that J.A.C. get additional help because his behavior and disrespect had become a danger to the other students as well as herself.

On April 2, 2004, Dr. Marc L. Zimmerman, PhD., a clinical psychologist, evaluated J.A.C. (Tr. 332-333). The report indicates that both J.A.C. and his mother reported that his medication was helping him to control himself at school. Dr. Zimmerman found that J.A.C.'s speech was clear, relevant, coherent, logical and rational. His affect was good, and his attention and concentration were adequate, and he displayed no impulse control problems. Dr. Zimmerman diagnosed ADHD in remission with medication.

School records from Oakdale Middle School show that J.A.C. was referred to the school office approximately forty times for student behavior problems, including disrespect, constantly making noise and talking out, addressing teachers and other students with profanity; hitting, bullying, and disrupting other students. (Tr. 248-288; Tr. 405-442).

On December 7, 2005, the Office of Mental Health/Mental Health Rehabilitation (OMH) completed an assessment of J.A.C. (Tr. 374-404). J.A.C. was referred for violence to others, including punching a child in the face, and a past history of hitting a peer with a plate, and stabbing a female with a pencil 1½ months prior to the assessment. (Tr. 374, 375, 379). OMH concluded that J.A.C.'s risk issues were that he displayed violent and highly aggressive behaviors across all settings. (Tr. 390). Due to J.A.C.'s extremely aggressive and impulsive behavior, a crisis plan was established to ensure his health and safety. (Tr. 393).

On March 2, 2006, Linda Thompson, school principal, ultimately recommended that J.A.C. be expelled, noting that he had been sent to the office forty times by seven different teachers and had been suspended six times. Ms. Thompson stated that they had "reached the limits of sensibility," and that J.A.C.'s behavior was worsening rather than improving (Tr. 287).

On March 15, 2006, Pupil Appraisal Services concluded their assessment to address concerns with J.A.C.'s problems in academics and social/behavior skills. (Tr. 347-373). J.A.C. was having difficulty in all subject areas, and his intellectual screening showed him to be of average intellectual functioning with difficulties in reading and math. (Tr. 348). His grades were D's and F's. (Tr. 349). J.A.C. was administered the Woodcock-Johnson Psycho-Educational Battery, Attention Deficit Hyperactivity Disorder Test, and the Social Skills Rating System. The Assessment concluded that J.A.C. was experiencing difficulty in all academic areas, and with social/behavior skills even after receiving support. (Tr. 360). He was experiencing significant emotional difficulties that significantly impeded his progress in the curriculum. The Assessment concluded that J.A.C.'s "educational deficits, emotional difficulties, and medical diagnoses result in reduced efficiency in school work and learning." (Id.). The Assessment concluded that J.A.C. was eligible for special instruction and counseling.

OMH's April 24, 2006 Quarterly Report reflected that he had been escorted home from school by police officers and was suspended from regular classes for the rest of the semester for fighting and disrespect to the principal. (Tr. 482, 484).

OMH's June 15, 2006 Quarterly Report shows that J.A.C. had been placed on Home Bound Schooling. (Tr. 460).

***Dr. McClure's Testimony***

Dr. McClure testified that although there was a Woodcock-Johnson achievement test in the record, it was difficult to assess J.A.C.'s learning disabilities without an IQ test. (Tr. 552). Dr. McClure noted that IQ tests are helpful to put achievement scores into context. (Id.). He stated, "[i]t's not really clear if that's a learning disability. Dr. McClure found that J.A.C. had a less than marked limitation in completing and attending tasks and in moving and manipulating objects. (Tr. 572-573).

As to J.A.C.'s ADHD diagnosis, Dr. McClure noted that, based on the report of Dr. Dowling, J.A.C. had responded well to Atretol and Wellbutrin and concluded that it the ADHD was not severe. (Tr. 554, 571). Dr. McClure concluded that J.A.C.'s problem was in his relationship with others and conduct behavior. (Id.). Dr. McClure testified that the school records noted the diagnosis "impulse control disorder," but that he was "thinking more of an oppositional defiant kind of thing bordering on conduct disorder itself more than impulse control." (Id.).

He noted that school records showed that J.A.C. had been suspended several times, and was recently expelled. (Tr. 572). He found that J.A.C. did okay moving and manipulating objects; cared for himself; his asthma was a thing of the past so his health was okay. (Id.).

Dr. McClure concluded that J.A.C. had no limitations in caring for himself, and no health and physical limitations. He also found that J.A.C. did not have an affective disorder and that J.A.C.'s testimony did not support a short term memory problem but that it was hard for him to judge J.A.C.'s long term memory. Dr. McClure found that J.A.C. had behavioral problems but did not think that J.A.C. met an organic mental disorder. (Tr. 576).

***Analysis***

## *I. Did J.A.C.'s condition functionally equal a listed impairment in Appendix 1?*

Carter asserts that J.A.C.'s ADHD and Impulse Control Disorder combined to produce an extreme limitation of functioning which prevented J.A.C. from attending school on a regular basis.

A medically determinable impairment or combination of impairments functionally equals a listed impairment if it results in marked limitations in two of the following six domains, or an extreme limitation in one domain:

(i) Acquiring and using information;
(ii) Attending and completing tasks;
(iii) Interacting and relating with others;
(iv) Moving about and manipulating objects;
(v) Caring for yourself; and,
(vi) Health and physical well-being.

Title 20 C.F.R. § 416.926a(b)(1)(i-vi).

A "marked" limitation in a domain means an impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. §416.926a(e)(2)(i).[4] A "marked" limitation is "more than moderate" but "less than extreme." Id. An "extreme" limitation will be found when an impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities" within a domain. 20 C.F.R.

---

[4] Title 20 C.F.R. §416.926(e)(2)(i) states as follows:
**(2) Marked limitation.**
(i) We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

§416.926a(e)(3).[5]  An extreme limitation is "more than marked," but "does not necessarily mean a total lack or loss of ability to function."  Id.  Day-to-day functioning is considered to be seriously limited regardless of whether the impairment limits only one activity within a domain, or several.

In the instant case, relying heavily on the testimony of the Dr. McClure, the ALJ found that J.A.C. had a less than marked impairment in acquiring and using information; less than marked limitation in attending and completing tasks; a marked limitation in interacting and relating with others; no limitation in moving about and manipulating objects; no limitation in the ability to care for himself; and no limitation in health and physical well-being.

The undersigned finds that the ALJ's finding that J.A.C. has no limitation in the ability to care for himself is not supported by the evidence.  The ALJ found:

### e.  Caring for yourself

This domain considers how well the claimant maintains a *healthy emotional* and physical state, including how well he satisfies his physical and emotional wants and needs in appropriate ways.  This *includes how the child copes with stress and changes in the environment* and whether the child takes care of his own health, possessions, and living area (20CFR 416.926a(k)).

The regulations provide that a school-age child without an impairment should be independent in most day-to-day activities (e.g. dressing and bathing), although he may still need to be reminded sometimes to do these routinely.  The child should

---

[5]  Title 20 C.F.R. §416.926(e)(3)(i) states as follows:
**(3) Extreme limitation.**
(i) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

> begin to recognize that he is competent in doing some activities and that he has difficulty with others. The child should be able to identify those circumstances when he feels good about himself and when he feels bad. *The child should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. The child should also begin to demonstrate consistent control over his behavior, and be able to avoid behaviors that are unsafe and otherwise not good. At this age, the child should begin imitating the behavior of adults he knows* (20 CFR 416.926a(k)(2(iv)).
>
> * * * *
>
> <u>The claimant has no limitation in the ability to care for himself</u>. Dr. Mclure testified that the claimant would have no limitation in this domain. The claimant is able to dress and bathe himself.

(Tr. 22-23) (emphasis added).

The March 15, 2006 Pupil Appraisal Services Report noted that J.A.C.'s social skills were addressed using the Social Skills Rating System which perceives the frequency and importance of behaviors influencing the student's development of social competencies and adaptive functioning at school and home. (Tr. 354). Results showed that J.A.C. had difficulty in controlling his temper, maintaining self-control, following directions, completing assignments within time limits, changing classroom activities, had temper tantrums, talked back to adults when corrected and used profanity, all of which combined to significantly interfere with his academic performance in the classroom. (Id.).

The government argues that J.A.C. does *not* have an extreme limitation preventing from school on a regular basis as Carter alleges. The government cites testimony of Carter and J.A.C. that J.A.C. attends schools at Oakdale; his favorite class is reading; he rides the bus to school and has friends at school; and his ADHD responds well to medication. This argument ignores that J.A.C. had been suspended many times over the years in both New Orleans and Oakdale and was finally expelled from Oakdale Middle School.

Notes by the Behavioral Center on June 15, 2006 show that J.A.C. had been on school suspension for "bruising another kid's eye" and "putting a scar on another kid's back." (Tr. 457). As to risk of harm to J.A.C., the report indicates that he "reported that other kids at school were picking at him. [J.A.C.] has a lot of mistrust and believes that the teachers and principal are meant and treat him unfair." (Tr. 458). The report shows he was placed on Homebound School and that he gets extremely agitated and aggressive when he gets upset; reacts without thinking; and gets physically violent and abusive (Tr. 460). The report also noted that, although J.A.C. had worked hard to get his school work in on time, he was aggressive and hyperactive and needed to learn how to remain calm. (Tr. 465).

Here, the ALJ addressed the evidence showing that J.A.C. could dress and bathe himself. This evidence is not substantial in light of the evidence showing that J.A.C.'s behavior problems caused him to be sent to the school office approximately 40 times at Oakdale Middle School, resulting in several suspensions and ultimately expulsion. These disruptions have obviously prevented him from attending school on a regular basis. An ALJ may not "pick and choose" only that evidence which supports his decision, but must address and make specific findings regarding the supporting and conflicting evidence, the weight to give that evidence, and reasons for his or her conclusions regarding the evidence. Armstrong v. Sullivan, 814 F.Supp. 1364, 1373 (W.D. TX 1993), citing, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir.1983); Rivera v. Sullivan, 771 F.Supp. 1339, 1351, 1354, 1356 (S.D.NY 1991).

The record shows that J.A.C. has not shown ability to recognize what is acceptable and unacceptable behavior or an ability to control his behavior or avoid behaviors that are bad for

him. Accordingly, the undersigned concludes that substantial evidence does not support the ALJ's determination that J.A.C. does not have at least a marked impairment in this domain.

As discussed above, an impairment functionally equals a listed impairment if it results in marked limitations in two domains or an extreme limitation in one domain. The record clearly shows that J. A.C. has at least a marked impairment in at least two areas: interacting and relating with others and his ability to care for himself. The ALJ's conclusion to the contrary is not supported by substantial evidence.

## *II. Did the ALJ Fail in His Duty to Develop the Record?*

Carter argues that the ALJ failed to adequately develop the record and prejudiced J.A.C. by failing to obtain IQ scores for him. Carter also argues that the ALJ erred in failing to submit 211 pages of post-hearing evidence to Dr. McClure, the psychologist who appeared at the hearing.

Carter's argument regarding the lack of IQ tests is based not only on Dr. McClure's comments regarding the lack of an IQ test in the record, but also on the fact that the results of a May 12, 2008 Wechsler Intelligence Scale for Children - IV showed that J.A.C. obtained a full scale IQ of 55 which reflected mild mental retardation. Listing 112.05 Mental Retardation provides that the required level of severity is met with a valid verbal, performance, or full scale IQ of 59 or less. Carter advises that she submitted these test results together with a new application for SSI benefits and, on October 1, 2008, J.A.C. was awarded benefits as of June 1, 2008.

Because the undersigned concludes that the medical record convincingly shows that J.A.C. functionally met the listings during the period in question, it is unnecessary to address

whether the ALJ failed in his duty to develop the record by failing to obtain IQ tests, or whether the 2008 IQ results should be considered as new and material evidence

Likewise, it is unnecessary to decide whether the ALJ failed in his duty to develop the record when he allegedly failed to submit 200+ pages of evidence to Dr. McClure. The record shows that legal services attorney Phill Edwards represented Carter at the hearing. She had recently discovered that the Behavioral Clinic had records for J.A.C., and therefore requested that the record be held open for her to submit these records. The ALJ agreed to do so. The record shows that Ms. Edwards mailed the ALJ these records along with a cover letter summarizing the documents. (Tr. 193).

Although the discussion during the hearing regarding exactly what records were being put into evidence is unclear, it is nonetheless clear that the ALJ provided the majority of these records to Dr. McClure, the medical expert. McClure testified that he had reviewed J.A.C.'s medical records and school records; he testified specifically about the Pupil Appraisal Services Report which included the Woodstock Johnson report, Dr. Dowling's report, and testified about the school records which Ms. Edwards characterized as the "some 40 incidents" where Ms. Carter was called to school and/or J.A.C. was suspended and finally expelled. (Tr. 553, 571, 573-4). Dr. McClure apparently did not receive the Behavioral Clinic's quarterly reports and some of the records from New Orleans. However, the undersigned has considered the medical and school records of evidence in their entirety in this report and recommendation, and, having concluded that J.A.C.'s impairments functionally meet the listings, the undersigned finds that it is unnecessary to decide whether the ALJ failed in developing the record with regards to the evidence submitted to Dr. McClure.

*Conclusion*

For the foregoing reasons, the undersigned concludes that the ALJ's decision is not supported by substantial evidence, and recommends that the Commissioner's decision be **REVERSED**, and that Carter be awarded supplemental security income benefits on behalf of her minor son, J.A.C., for the period in question. As noted above, J.A.C. has already awarded benefits as of June 1, 2008, based upon a new application. Accordingly, this recommendation applies only to the period prior to June 1, 2008.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by**

**the District Court, except upon grounds of plain error. See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).**

Signed at Lafayette, Louisiana, on March 29, 2009.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)